**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JEFFREY EDMOND,

                Plaintiff,

vs.                                      Case No.  3:08-cv-1184-J-34JRK

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

### I.  Status

Jeffrey Edmond ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for supplemental security income.  His alleged inability to work is based on the following impairments: "missing left eye, disfigured right hand, paralyzed left foot, [and] back pain with muscle spasms."  Transcript of Administrative Proceedings (Doc. No. 18; "Tr.") at 19, 161; see also Tr. at 139 (listing impairments limiting ability to work as "[m]issing left eye plus sore hand and foot and arthritis").  After a telephonic hearing held on August 14, 2007, Tr. at 309-56, Plaintiff was found not disabled by an Administrative Law Judge ("ALJ"), in a Decision entered on January

---

[1]      Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within fourteen (14) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual allegations on appeal.

24, 2008.  Tr. at 10-16.  Plaintiff has exhausted the available administrative remedies, and the case is properly before the Court.[2]

Plaintiff, who is currently incarcerated and is proceeding pro se, filed a Memorandum in Support of Complaint (Doc. No. 23; "Pl.'s Mem.") on September 17, 2010.  Plaintiff lists the impairments that he believes limit his ability to work: "no longer hav[ing] a left eye" which renders him blind on the left side and makes him particularly susceptible to "catching infections in the eye"; "the vision in [his] right eye [has] gotten worse" which has caused him to have to wear glasses; "nerve damage" in his right arm, which "[a]ffects the use of two fingers on [his] right hand" and does not allow him to "rotate [the arm] or turn [it] certain ways"; "a permanent foot drop in [his] left foot," also the result of nerve damage, which prevents him from lifting his left foot and causes "paralyzation" and a "heavy limp"; and "arthritis," which causes "back problems[.]"  Id. at 1-3.  Plaintiff indicates that "[a]ll of [his] issues are caused from multiple gunshot wounds [occurring on] December 28, 2000[.]"  Id. at 3.  Plaintiff does not specifically challenge any of the ALJ's findings; rather, he concludes his memorandum with the following:

---

[2]        Plaintiff's claim was originally dismissed by a prior ALJ after Plaintiff failed to appear for his hearing. Tr. at 45, 51.  Plaintiff appealed the dismissal to the Appeals Council.  Tr. at 47-48, 51.  On August 19, 2005, the Appeals Council remanded the case for a hearing because "there [was] no indication that the hearing office attempted to contact [Plaintiff] for an explanation as to why the acknowledgment [of notice of hearing] card was not returned," and "there was [no] evidence before the [ALJ] establishing that the notice of the hearing was actually received." Tr. at 52.  On remand, the Social Security Administration had some difficulty communicating with Plaintiff, presumably due in large part to Plaintiff being incarcerated.  See Tr. at 57-123.  After three failed attempts to proceed with a hearing, Tr. at 286-89, 290-305, 306-08, a hearing was finally held on August 14, 2007.  Tr. at 309-56.  Following the hearing, on January 24, 2008, the unfavorable Decision was issued.  Tr. at 10-16.  Plaintiff again appealed to the Appeals Council.  Tr. at 8, 284-85.  On October 3, 2008, the Appeals Council denied Plaintiff's request for review.  Tr. at 5-7.  In the Appeals Council's denial notice, Plaintiff was advised that he "ha[d] 60 days to file a civil action (ask for court review)."  Tr. at 6.  Plaintiff was further told that "[t]he 60 days start the day after you receive this letter.  We assume you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period."  Tr. at 6.  On December 9, 2008, Plaintiff timely filed this action seeking review of the Commissioner's final decision (Doc. No. 1).

> It probably will be easy for someone to den[y] my claim based on this motion [sic] due to the fact I did not have the privilege of the Law Library due to me being housed in confinement[.] But if you we[]re to see me physically and not through this motion [sic], and see all of these impairments on one body [a]nd see how they cause my body to function you would grant my appeal.

Id. at 3-4.

Defendant asserts that "the ALJ properly found Plaintiff not disabled at step one of the sequential evaluation, and substantial evidence supports the ALJ's decision."[3] Memorandum in Support of the Commissioner's Decision (Doc. No. 26; "Def.'s Mem."), filed November 16, 2010, at 3-4.  Defendant contends "Plaintiff is not entitled to relief . . . because the ALJ found that Plaintiff was not disabled at step one.  Therefore, the ALJ was not required to discuss or evaluate Plaintiff's medical conditions."  Id. at 7-8 (citing 28 C.F.R. § 416.920(a)(4)(i), (b)).

Upon review of the record and the parties' memoranda, the undersigned finds that the ALJ's Decision with respect to the step one findings is not supported by substantial evidence.  Accordingly, it is recommended that the ALJ's Decision be reversed and remanded for further proceedings consistent with this Report and Recommendation.

## **II.  Facts**

### A.  Overview

Plaintiff was twenty-seven years old when his hearing was held before the ALJ on August 14, 2007.  Tr. at 317.  Plaintiff's self-reported criminal and incarceration history includes serving one year in prison in 1999 as a result of a conviction for selling cocaine;

---

[3]     As discussed in more detail infra at Part III pp. 14-15, the ALJ found at step one that Plaintiff was engaging in substantial gainful activity during the period in which he would have been eligible to receive supplemental security income because Plaintiff was selling illegal drugs during this period.  See Tr. at 14-16.

being charged with grand theft of a motor vehicle in 2001[4]; serving ten months of jail time in 2005 as a result of a "violation of an injunction"; and being sentenced in July 2006 to seven years' incarceration as a result of a conviction for selling cocaine, the sentence Plaintiff is currently serving. Tr. at 317-18. Plaintiff's educational history includes completing the tenth grade, and later obtaining his GED while in jail in 2005. Tr. at 143, 317. Plaintiff's past relevant work consists of being a cook in a fast food restaurant for approximately one month in October 2000. Tr. at 140, 149, 325-26. According to Plaintiff, he also worked for a temporary agency called "Randstand" for one or two months in October 2005 but was "fired because they said [he] . . . was slow, [he] wasn't fast enough to be working." Tr. at 302, 303; see also Tr. at 318-19. While working for the temporary agency, Plaintiff performed "inventory" work. Tr. at 319.

Plaintiff contends he became unable to work on July 30, 2003, the date his application for supplemental security income was filed. Tr. at 146. As previously noted, Plaintiff's alleged disabling conditions are the result of a shooting that occurred on December 28, 2000. Pl.'s Mem. at 3; Tr. at 325. According to Plaintiff, he was released from prison for the first time on November 2, 2000; shortly after his release, on December 28, 2000, Plaintiff was shot twelve times by an individual who was paid by another individual to kill Plaintiff because of "a little problem" occurring before Plaintiff went to prison in 1999. Tr. at 322-23, 325. The "little problem" happened during "a dice game" played "in the street" sometime in 1999 by Plaintiff and the individual alleged to have later hired someone to kill

---

[4]     According to Plaintiff, this charge was later dropped, Tr. at 318, but it appears he served some time in confinement as a result of the charge. See Tr. at 232 (Department of Corrections initial psychological screening record identifying "received" date as January 29, 2002, crime as "grand theft motor vehicle," and "current term" as "1 yr 6 mo 0 da") (capitalization omitted) (duplicates of record found at Tr. at 235, 238).

Plaintiff.[5]  Tr. at 324.  After the shooting, Plaintiff lost his left eye and suffered from other medical problems.  Tr. at 300, 313, 315-17.

### B.  Medical Evidence in the Record

Records from Baptist Primary Care dated January 18, 2001 to September 10, 2001 document treatment Plaintiff received following the shooting.  Tr. at 180-91.  Although the records are largely difficult to read, it appears that during this time, Plaintiff primarily complained of and was treated for vision change, chest pain, joint pain, and back pain.  Tr. at 180-91.

Records from the Florida Department of Corrections contain information regarding Plaintiff's medical treatment for most of the year 2002 while Plaintiff was in prison.  Tr. at 192-242.  During this time, Plaintiff had many issues with his left eye requiring medical attention, including a recurrent eye infection.  Tr. at 194, 195, 197, 198, 199, 200-01, 204, 213-14.  Plaintiff complained of "pain to area of excision of bullet to [right] chest on Oct. 2001."  Tr. at 202.  Plaintiff also had some bleeding from his left ear.  Tr. at 200-01.  It was noted that Plaintiff had "multiple scars, bullet entrances & exits on chest & abdomen[.]"  Tr. at 222 (capitalization omitted).

X-Rays were taken on at least two occasions during this period of incarceration.  On January 31, 2002, X-Rays were taken of Plaintiff's right forearm, right wrist, and lumbar spine, due to complaints of back pain and problems with his right forearm and wrist.  Tr. at 242.  With respect to the right forearm, it was noted that "[a] fracture of the radius [had] been

---

[5]       Plaintiff first testified that the shooting was "because of drug[s]," but he later indicated it was the result of the pre-incarceration altercation involving a dice game.  Tr. at 323-24.

reduced with an intramedullary rod" and "[t]he fracture [had] healed with adequate alignment and callous formation, although the healing has not been solid across the fracture line." Tr. at 242.  With respect to the right wrist, it was noted that "[t]he carpal bones [were] well maintained" and "[t]here [was] no evidence of fracture or dislocation." Tr. at 242.  With respect to the lumbar spine, the impression was "partially sacralized L5 on the right side." Tr. at 242 (capitalization omitted).  On February 6, 2002, an X-Ray of the thoracic spine was taken due to complaints of back pain.  Tr. at 241.  This X-Ray revealed Plaintiff had a "normal thoracic spine[.]" Tr. at 241 (capitalization omitted).

On July 30, 2003, Plaintiff appeared at the Shands Jacksonville Emergency Department complaining of left eye socket pain and drainage. Tr. at 243. Plaintiff was given prescriptions for Keflex, Motrin, and Erythromycin Ophthalmic Ointment, and he was released with instructions to make an appointment with Shands Jacksonville Opthamology Clinic.  Tr. at 244.

On September 10, 2003, Plaintiff again appeared at the Shands Jacksonville Emergency Department complaining of a sore throat and left eye socket drainage.  Tr. at 246.   It was noted that Plaintiff's symptoms may have been attributable to "Pharyngitis/Tonsillitis" and/or "Conjunctivitis[.]"  Tr. at 247 (capitalization omitted), 248 (capitalization omitted), 251.  X-Rays and CT Scans revealed "[n]o acute abnormality of the cervical spine or neck soft tissues," "[m]ild asymmetric enlargement of the left tonsillar fossa," and "[n]o focal intracerebral abnormality[.]"  Tr. at 255, 256, 257.  Plaintiff was instructed to make an appointment with Shands Jacksonville Oral and Maxillofacial Surgery, Clinic E.  Tr. at 247.

On October 15, 2003, Plaintiff was examined by Thao X Le, M.D., at the request of the Division of Disability Determinations.  Tr. at 258-262A.  Plaintiff complained of pain in the back, right hand, left foot, and left eye socket.  Tr. at 258.  At the time, Plaintiff was taking "Motrin, PCN, Tylenol."  Tr. at 258.  Dr. Le diagnosed Plaintiff with "[e]nucleation L eye," "[o]steopenia with chronic pain in hands, feet and back," "[a]nkylosis PIP R 4th and 5th fingers," "[m]ild foot drop, L foot," "Hx of fracture distal radius R with ORIF with chronic pain and limitation of motion R wrist and atrophy R hand," and "Hx of GSW to L eye, R arm, R elbow, R wrist and hand, abdomen and back[.]" Tr. at 261.  According to Dr. Le, Plaintiff's range of motion in all areas identified on the Range of Motion Report Form was within normal limits.  Tr. at 262-262A.

The record contains two Physical Residual Functional Capacity Assessment Forms.  Tr. at 263-70, 273-80.  These forms were filled out by non-examining physicians Daria F. Marranzini, M.D. on October 26, 2003, and by Eric C. Puestow, M.D. on December 29, 2003.  Tr. at 270, 280.  With respect to exertional limitations, both physicians opine in the forms that Plaintiff can occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour workday; and Plaintiff is "limited in upper extremities" with respect to pushing and/or pulling.  Tr. at 264, 274 (emphasis omitted).  With respect to postural limitations, both physicians indicate Plaintiff can occasionally climb ramps or stairs but can never climb ladders, ropes, or scaffolds.  Tr. at 265, 275.  Dr. Marranzini believes Plaintiff can frequently balance, stoop, kneel, crouch, and crawl, Tr. at 265; Dr. Puestow thinks Plaintiff can only occasionally balance, stoop, kneel, crouch, or crawl.  Tr. at 275.  As

far as manipulative limitations, both physicians opine Plaintiff is unlimited with respect to reaching all directions and feeling, but limited in the right hand with respect to handling and fingering.  Tr. at 266, 276.   In the category of visual limitations, Dr. Marranzini thinks Plaintiff's field of vision is limited but there are no other limitations.  Tr. at 266.  Dr. Puestow states Plaintiff's field of vision and depth perception are limited.  Tr. at 276.  Both physicians opine there are no communicative limitations.  Tr. at 267, 277.  Finally, both physicians state there are no environmental limitations with the exception of avoiding hazards: Dr. Marranzini states that Plaintiff should avoid all exposure to hazards such as machinery and heights; Dr. Puestow states that Plaintiff should avoid concentrated exposure.  Tr. at 267, 277.

### C. Hearings Before the ALJ

The record contains transcripts of three attempts to proceed with a hearing, followed by a transcript of the hearing that was eventually held.  The first attempted hearing occurred on August 29, 2006.  Tr. at 286-89.  Plaintiff's attorney at the time had recently learned Plaintiff had been arrested and was incarcerated.  Tr. at 288.  The hearing was continued so Plaintiff's attorney could attempt to locate Plaintiff and discuss the case with Plaintiff before proceeding any further.  Tr. at 288-89.  On December 13, 2006, Plaintiff's attorney withdrew from representing Plaintiff.  Tr. at 73.

The second attempted hearing occurred on April 19, 2007.  Tr. at 290-305.  Plaintiff appeared telephonically and pro se from the Calhoun Correctional Institution.  Tr. at 292.  This hearing was continued so Plaintiff could attempt to obtain representation.  Tr. at 292-94.  Plaintiff was advised that the ALJ would "only consider the period from the time that [he] filed

for SSI, which is July of '03, until the time that [he was] incarcerated in June of '06." Tr. at 301.

The third attempted hearing was held on May 17, 2007. Tr. at 306-08. This hearing was continued because the ALJ was unable to reach Plaintiff due to "the prison phone number [being] busy continuously for 30 minutes" prior to the hearing. Tr. at 308.

Finally, the hearing was held on August 14, 2007, during which Plaintiff and a vocational expert testified. Tr. at 309-56. Plaintiff proceeded pro se, as he had not found counsel to represent him. Tr. at 311-12. The ALJ was particularly interested in Plaintiff's alleged involvement in selling illegal drugs during the period of time between the alleged onset date (July 30, 2003) and Plaintiff's most recent date of incarceration (June 2006) (the "relevant time period"). See generally Tr. at 309-56. In fact, the ALJ attempted no fewer than ten times to get Plaintiff to admit to selling illegal drugs during the relevant time period, or to get Plaintiff to elaborate regarding the alleged sale of illegal drugs during the relevant time period. See Tr. at 320, 325-27, 328-31, 333-34, 338, 341, 342.

Plaintiff originally admitted in response to questioning by the ALJ that he started selling drugs during the relevant time period after he was "laid off" from the temporary agency in 2005. Tr. at 319-20. Plaintiff indicated he made between $500 and $1,000 per week selling drugs. Tr. at 320. Plaintiff then testified about the events surrounding his shooting in December 2000. Tr. at 322-26, 334-35. When asked whether he was selling drugs during the time frame when the shooting occurred, Plaintiff stated he "was working at Krystals when [he] got shot." Tr. at 322; see also Tr. at 325.

The ALJ again asked Plaintiff when, after his release from prison in November 2000, Plaintiff resumed selling drugs. Tr. at 326-27. Plaintiff answered, "Way in 2005. 2006." Tr. at 327. Plaintiff indicated that between 2000 and 2005, his family and his "baby mom" supported him financially. Tr. at 327. Although Plaintiff clearly testified that his family and his "baby mom" supported him financially during this time, this testimony was given during a confusing and somewhat disjointed exchange between the ALJ and Plaintiff in which Plaintiff ultimately appears to have admitted to selling cocaine later in 2006.[6] Tr. at 328.

---

[6]     The exchange was as follows:

Q      And between 2000 and 2005, how did you support yourself?
A      Really I wasn't.  My family.
Q      Because you only worked for a short period of time in - -
A      I know.
Q      - - in 2005.  I don't have any work activity for 2003 - -
A      I was dependent on my family.
Q      - - 2004 - -
A      I'm telling you what it was.
Q      So in 2003 and 2004, your family was supporting you?
A      What they could.
Q      Where were you living?
A      In 2003, 2004?
Q      Yes, sir.
A      With my, my baby mom.
Q      So she paid for all of your expenses?
A      Yes, sir.
Q      For your room and board and for your food and for everything?
A      Yes, sir.
Q      Now, if you had to pay that, probably that would have cost you more than 4 or $500 a
       month, no?
A      Yes, sir.
Q      And she never expected you to pay her back, your mother - -
A      I ain't going to say that.  She always, we had, like I say, I had my claim, my disability
       claim in so we was hoping for that, and I don't know.
Q      And were you on drugs during that period of time?
A      What period of time?
Q      From 2000 to - -
A      No, sir.
Q      - - 2006.
A      Medication drugs.  Around 2006, I ain't going to start, I started smoking weed again.
Q      And you started selling cocaine again?
A      Yes, sir.  Actually, [INAUDIBLE] only opportunity, that's the only option I had at the time.

                                                                                    (continued...)

-10-

Plaintiff was then asked again about the amount of money he made selling drugs, and he

confirmed he made "a couple thousand dollars a month" from drug proceeds.  Tr. at 329-30.

After confirming this, Plaintiff stated as follows:

> But I wasn't, I didn't stay in there long, Mr., I don't know your name, Judge.  Like
> I said, I started selling, I got back into selling drugs like May [2006].  I got locked
> up in June [2006].  So that's why I wasn't, I didn't make nothing really.

Tr. at 330.  The ALJ again attempted to get Plaintiff to admit to selling drugs for a longer

period of time than that one month prior to Plaintiff's incarceration to which Plaintiff would

admit, declaring, "You sold drugs for a couple of years."  Tr. at 330.  Plaintiff responded

"Yeah, back in '99 and, from 90s, yeah, I sold drugs for years, but I thought you w[ere]

discussing about after I got shot."  Tr. at 330.

It then became evident why the ALJ was interested in the time frame of Plaintiff's

alleged drug dealing.  The ALJ was attempting to ascertain whether the illegal drug dealing

constituted substantial gainful activity during the relevant time period:

> Q    That's all really, that's probably the only work activity that you've had for,
>      of any significance, the sale of drugs because you don't have any
>      earnings records in your earnings except for that staffing services that
>      you worked in 2005.
>
> A    Yes, sir.
>
> Q    And you told me that you worked there for, what, a month or two only?
>
> A    Yes, sir.

---

[6](...continued)
>      There wasn't nothing coming in - -
> Q    Okay.
> A    - - and there was a lot of problem.

Tr. at 327-28.

Q        I mean, selling drugs is really more lucrative, isn't it, Mr. Edmonds?

A        What do you mean more lucrative?

Q        Get more money.

A        Oh was I getting more money than when I was working?

Q        Sure.

A.       Yes, sir.  Because I never had, I couldn't hold, I ain't never hold a job that
         long.

Q        Except for the sale of drugs.

A        If you want to consider that a job.  I don't consider that a job.

Tr. at 330-31.

        After this exchange between Plaintiff and the ALJ, Plaintiff testified about the medical

issues he believes limit his ability to work.  Tr. at 331, 335.  When asked by the ALJ whether

his missing eye prevented him from selling drugs, Plaintiff answered, ". . . I'm not on nobody

clock selling drugs . . . I don't have to look.  I'm on my own . . . criteria."  Tr. at 331; see also

Tr. at 332, 333-34.

        As far as daily activities in prison, Plaintiff testified he "can't stand over 15 minutes,"

and he sits most of the time.  Tr. at 335.  Plaintiff does not exercise.  Tr. at 335.  Plaintiff

spends the majority of his time reading and watches some television.  Tr. at 340, 341.

Plaintiff bathes himself but does not shave because he has "a shaving pass."  Tr. at 341.

Plaintiff can write with his right hand, he can button his shirt, he can pull his zipper, and he

can use two of his right fingers to pinch.  Tr. at 342-43.  Plaintiff can also lift some small

objects with his right hand.  Tr. at 343.  Plaintiff has a housekeeping job in prison.  Tr. at

336.  His assignment is to clean the sinks, which reportedly takes only "two minutes."  Tr.

at 336.   Prior to working in housekeeping, Plaintiff worked in the kitchen.   Tr. at 336.

However, Plaintiff "couldn't hold that job" because it required "too much standing" and "[t]oo

much lifting."  Tr. at 336.

Despite prison records indicating Plaintiff has a history of substance abuse, Plaintiff

denied such a history.  Tr. at 337-38.

Following Plaintiff's testimony, the ALJ heard testimony from vocational expert Ronald

Spitznagel.  Tr. at 344-53.  The ALJ provided the following hypothetical to the vocational

expert:

> Let's assume that in an eight-hour workday, [Plaintiff] can stand and sit up to six
> hours; lift 20 pounds occasionally[;] . . . ten pounds frequently[;] . . . [h]e would
> be prevented from doing a job that involves acute binocular visual acuity[;] [a]nd
> he would be prevented from working at heights, at unprotected heights or
> around dangerous machinery[;] . . . [and] [h]e would not be able to climb
> ladders, ropes, or scaffolds.  He may have some problems with jobs that, where
> depth perception is involved.

Tr. at 348-49.  The vocational expert testified that Plaintiff "could go back to his illegal

activity" with those limitations; specifically, the sale of illegal drugs.  Tr. at 349.  The

vocational expert also identified other jobs that Plaintiff could perform which exist in

significant numbers in the national economy: "dispatcher of maintenance service";

"[t]elephone solicitor"; "[i]nformation clerk"; "ticket taker"; "[c]ollator operator"; "salesperson,

books"; and "film rental clerk[.]"  Tr. at 349-52.  The ALJ then added to the hypothetical

additional limitations of "sitting six to eight hours and lifting 20 pounds occasionally with his

left upper extremity[.]" Tr. at 352.  According to the vocational expert, Plaintiff would still be

able to perform the jobs of "ticket taker"; "dispatcher maintenance service"; and

"[i]nformation clerk[.]" Tr. at 352-53.

After Plaintiff expressed concerns with being able to obtain, perform, or otherwise keep the jobs in question, Tr. at 353-54, the ALJ explained that the vocational expert was merely testifying that such jobs existed "in the national economy that a person with the restrictions and limitations that [the ALJ] indicated to [the vocational expert] could do." Tr. at 354. Plaintiff asked the ALJ whether he would be examined by a physician again. Tr. at 355. The ALJ responded that Plaintiff would not again be examined, as he was in prison, and the ALJ had Plaintiff's medical documentation in the file, including documentation of a consultative examination. Tr. at 355. However, the ALJ indicated that he was "going to request some additional records from jail" before he made his decision. Tr. at 355; see also Tr. at 315 (ALJ indicating he would request 2005 records from Shands Jacksonville Emergency Room), 316 (ALJ indicating the record would be left open "so we can obtain some additional medical evidence"). Despite the ALJ indicating additional medical evidence would be obtained, the additional medical evidence never made its way into the record. See Tr. at 4 (List of Exhibits).

### III. The ALJ's Decision

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry described in the Code of Federal Regulations, determining as appropriate whether the Plaintiff: 1) is currently employed or engaging in substantial gainful activity;  2) has a severe impairment;  3) is disabled due to an impairment meeting or equaling one listed in the regulations;  4) can perform past relevant work;  and 5) retains the ability to perform any work in the national economy. See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  If at step one the ALJ finds that the

individual is "doing substantial gainful activity," the ALJ may "find that [the individual is] not disabled" without proceeding with the rest of the sequential inquiry.  20 C.F.R. §§ 404.1520, 416.920.

Here, the ALJ found at step one that Plaintiff had been engaging in substantial gainful activity during the relevant time period through the date of Plaintiff's incarceration in 2006 by virtue of his illegal drug dealing, so the ALJ did not perform the rest of the five-step sequential inquiry set forth in 20 C.F.R. §§ 404.1520 and 416.920.  Tr. at 14-16.  Despite not proceeding with the sequential inquiry, the ALJ noted that even if Plaintiff "did not perform substantial gainful activity, the vocational expert testified that there were jobs such as a Dispatcher or Information clerk which would require only a little standing and six to eight hours of sitting."  Tr. at 16.  The ALJ concluded Plaintiff was not under a disability[7] from July 30, 2003 (the alleged onset date) through the date of the Decision.  Tr. at 16.

## IV.  Legal Standard

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'"  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence

---

[7]     "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A).

standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Falge</u>, 150 F.3d at 1322 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence."  <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); <u>see also</u> <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1080 (11th Cir. 1988); <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## V. Discussion

As previously noted, Plaintiff does not raise any specific grounds for challenging the ALJ's Decision.  <u>See generally</u> Pl.'s Mem.  Plaintiff merely complains that he has many impairments that affect his ability to function and hypothesizes that his "claim" will be denied. <u>Id.</u>  In response to Plaintiff's complaints, however, Defendant does raise a specific issue for the Court to consider: whether "substantial evidence supports the ALJ's finding that Plaintiff was not disabled because he engaged in substantial gainful activity after his alleged onset date."  Def.'s Mem. at 3 (capitalization omitted).

As summarized in Part IV, <u>supra</u>, this Court has a duty to ensure that findings of fact are supported by substantial evidence.  <u>See</u> <u>Doughty</u>, 245 F.3d at 1278.  That duty, combined with Defendant's presentation of a specific issue, merits consideration of the issue despite Plaintiff failing to raise it.  An almost identical situation was presented in <u>Felder v. Astrue</u>, No. CV 108-078, 2009 WL 2591767, at *1-6 (S.D. Ga. Aug. 21, 2009)

(unpublished).[8]  In <u>Felder</u>, "[c]ontary to the Court's instructions," a <u>pro se</u> plaintiff did "not enumerate[] any specific issues for judicial review, and she [did] not cite[] any authority in her brief."[9]  <u>Id.</u> at *3.  Instead, "[the p]laintiff state[d] that according to the social security administration definition of disability, she believes she has been, and continues to be, disabled."  <u>Id.</u>  The plaintiff also attached to her brief some medical records and evaluations. <u>Id.</u>  The court in <u>Felder</u> observed that "based on the tenor of her brief, [the p]laintiff seemingly wants the Court to revisit the issue of disability.  This the Court will not do."  <u>Id.</u> The court stated that "[w]ithout any specific enumerations of error, the Court is limited to scrutinizing the record in its entirety to determine whether substantial evidence supports the Commissioner's findings and whether the law has been correctly applied."  <u>Id.</u> (citing 42 U.S.C. § 405(g)).

The <u>Felder</u> court found that the ALJ had erred in failing to explain the weight afforded to the opinion of a treating physician.  <u>Id.</u> at *3-4.  In doing so, the court recognized the defendant's concession that the ALJ had erred in this regard, and despite the defendant urging the court to find that the error was harmless, the court declined to make such a finding.  <u>Id.</u> at *5.  Accordingly, the matter was reversed and remanded for further proceedings.  <u>Id.</u> *1, *6.

Here, the undersigned finds it appropriate to consider whether the ALJ erred in concluding Plaintiff was engaging in substantial gainful activity for two reasons: (1) the

---

[8] In <u>Felder</u>, the United States Magistrate Judge issued a report and recommendation which was adopted as the opinion of the court.  <u>Felder</u>, 2009 WL 2591767, at *1.

[9] Similar instructions were given to Plaintiff in this Court's Scheduling Order (Doc. No. 19): "Plaintiff must identify with particularity the grounds upon which the administrative decision is being challenged. Any such challenges must be supported by citation to the record of the pertinent facts and by citations of the governing legal standards."

Court's duty to scrutinize the record to ensure that the ALJ's decision is reasonable and supported by substantial evidence; and (2) Defendant's presentation of the specific issue. See Felder, 2009 WL 2591767 at *1-6; see also Powell v. Heckler, 773 F.2d 1572, 1575 (11th Cir. 1985) (stating that "th[e] presumption of deference [afforded to the Commissioner's decision] does not permit us to close our eyes when presented with clear error in application of the governing statute, or with evidence insubstantial on its face") (internal citations omitted); Smith v. Astrue, No. 1:08cv933-CSC, 2009 WL 4894794, at *7 (M.D. Ala. Dec. 11, 2009) (unpublished) (sua sponte raising issue regarding "questioning of the vocational expert" and finding the ALJ "erred by failing to include pain in the hypothetical" but concluding that "the error [wa]s harmless").

    As previously summarized, the ALJ stopped the sequential evaluation inquiry at step one.  Tr. at 15.  With respect to step one, the ALJ made the following finding: "[Plaintiff] has engaged in substantial gainful activity since he filed his application for supplemental security income[.]"  Tr. at 15 (citing 20 C.F.R. §§ 416.920(b) and 416.971 et seq.).  The ALJ went on to attempt to support this finding as follows:

> [Plaintiff] testified that from 2003 through his incarceration, he was earning $2,000.00 per month selling cocaine.  He testified that he did not pursue other employment because he believed that he did not have any other options. [Plaintiff's] prison records document that his most recent conviction was for cocaine sales, manufacturing, and delivery. [Plaintiff] testified that he served a year for cocaine sales in 1999, and sold cocaine for more than two years in the 1990's.  In addition to selling cocaine, [Plaintiff] testified that he has also played illegal dice games.

Tr. at 15 (citation omitted).  The ALJ then stated, "Social Security Ruling 94-1c [1994 WL 8408] provides that illegal activity can constitute substantial gainful activity, as an individual who demonstrates the ability to earn money through illegal means is just as undeserving of

benefits as an individual who demonstrates the ability to earn money without violating the law."  Tr. at 16.  The ALJ went on to find that Plaintiff's "work as a cocaine salesperson required significant physical and mental activities such as procuring a product, pricing a product, identifying purchasers, making arrangements to meet with purchasers, distributing the product to the purchasers, and collecting payment from the purchasers."  Tr. at 16. According to the ALJ, "'sales,' in general, is the kind of work that is ordinarily done for pay or profit, and . . . [Plaintiff] testified that he did in fact make a profit. [Plaintiff's] incarceration is the only apparent reason that he stopped selling cocaine."  Tr. at 16.  Finally, the ALJ concluded that "[t]here was no continuous 12-month period prior to the claimant's incarceration[10] during which the claimant did not engage in substantial gainful activity."  Tr. at 16.  Based upon the finding that Plaintiff was engaging in substantial gainful activity during the relevant time period, the ALJ held that Plaintiff is not and has not been disabled "at any time since July 30, 2003 . . . the date the application was filed."  Tr. at 16.

The ALJ relied on nothing more than the testimony of Plaintiff and Plaintiff's prison records to conclude he was selling drugs during the relevant time period (July 30, 2003-June 2006).  Tr. at 15.  As an initial matter, Plaintiff's prison records do not reflect the length of time Plaintiff was selling drugs prior to his incarceration.  The records merely reflect that he is currently incarcerated for "Cocaine-Sale/Manuf/Deliv."[11]  Tr. at 97 (capitalization omitted). Therefore, the only evidence upon which the ALJ's factual finding regarding the sale of

---

[10]      Except under certain limited circumstances which do not appear to apply here, an individual incarcerated in a public institution is not entitled to receive supplemental security income during any month(s) throughout which he or she is incarcerated.  See 42 U.S.C. § 1382(e); 20 C.F.R. § 416.211.

[11]      Plaintiff does not dispute that he was convicted in July of 2006 as a result of selling illegal drugs.  Tr. at 318.

drugs can be based is Plaintiff's testimony.  Although the ALJ did not explicitly make a credibility determination, the ALJ apparently credited Plaintiff's testimony because the testimony was relied upon in arriving at the factual finding.  A careful review of the record, however, shows that the ALJ misinterpreted, misconstrued, or otherwise misstated Plaintiff's testimony about this key issue.

The ALJ recounted Plaintiff's testimony as Plaintiff having admitted to selling drugs "from 2003 through [the date of] his incarceration [in June 2006]."  Tr. at 15.  This account of the testimony, which led to the factual finding that Plaintiff was engaging in substantial gainful activity during the entire relevant time period,[12] is erroneous.  As reviewed in detail in Part II. C. supra, Plaintiff ultimately only admitted that he engaged in the sale of illegal drugs for one month during the relevant time period, and depending on how his earlier testimony is construed, possibly for about two years (from sometime in 2005 to his incarceration in June 2006).  See Tr. at 318-20, 330.  Importantly, Defendant concedes Plaintiff only "testified that he had sold cocaine in 2005 and 2006, as well as during the 1990s[.]" Def.'s Mem. at 2 (citations omitted); see also id. at 6, 7 n.6.  Furthermore, Defendant recognizes that Plaintiff ultimately "testified that he only sold drugs for about a month before he was arrested in June 2006," but Defendant points out that "earlier in the hearing, [Plaintiff] testified that he began selling drugs in 2005 when he was laid off from his job[.]" Id. at 7 n.6 (citations omitted).  From Plaintiff's alleged onset date of July 30, 2003 through at least 2005 (and possibly the month prior to Plaintiff's incarceration), however, there appears to be no evidence in the record, much less substantial evidence, that Plaintiff

---

[12]    See Tr. at 15 (finding "[Plaintiff] has engaged in substantial gainful activity since he filed his application for supplemental security income") (citations omitted).

was engaging in such activity.[13]  See Hillsman v. Bowen, 804 F.2d 1179, 1181-82 (11th Cir. 1986) (stating "[a] reviewing court may not look 'only to those parts of the record which support the ALJ,' but instead 'must view the entire record and take account of evidence in the record which detracts from the evidence relied upon by the ALJ'") (quoting Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983)); see also Flowers v. Harris, 616 F.2d 776, 778 (5th Cir. 1980)[14] (indicating the "narrow review" standard "does not prohibit [the] court from scrutinizing the record in its entirety to determine the reasonableness of the [Commissioner's] decision") (citation omitted).[15]

---

[13]     It could be said that the almost complete lack of earnings by Plaintiff during the entire relevant period (and beyond) circumstantially supports the ALJ's finding that he was engaged in the sale of illegal drugs during the relevant period; the lack of earnings tends to show that Plaintiff may have been earning money through illegal means. However, Plaintiff indicated that between 2000 and 2005, his family and his "baby mom" supported him financially.  Tr. at 327.  Given that the ALJ implicitly credited Plaintiff's testimony by relying on it and by electing not to discredit any portion of it, this Court is bound by the credibility determination and may not discredit Plaintiff's testimony.  See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating the court's "review precludes deciding facts anew, making credibility determinations, or reweighing the evidence") (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Therefore, the Court must accept Plaintiff's testimony that he received financial support from his family and "baby mom" from 2000 to 2005, as the ALJ apparently did, and the lack of earnings during this time cannot amount to substantial evidence to support the ALJ's factual finding.

[14]     In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all the decisions of the former United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981.

[15]     Even assuming that the ALJ had accurately recounted Plaintiff's testimony, the insubstantial evidence to support the finding that Plaintiff was engaged in substantial gainful activity for the entire relevant time period, rather than a portion of the relevant time period, would require remand.  It is well established in the Eleventh Circuit that "[s]ubstantial gainful activity clearly does bar benefits under the statute regardless of any actual disability of the claimant.  But it bars such benefits only for such periods of activity."  Powell, 773 F.2d at 1576 (emphasis in original).  In the earlier case of Ambers v. Heckler, 736 F.2d 1467, 1468-70 (11th Cir. 1984), the Court held that a plaintiff met the listing for mental retardation "which [made] her eligible for disability benefits," so "[c]onsideration of the fact that [the plaintiff] could return to her past work [was] not a relevant inquiry" in light of the listing being met.  Later in Powell, a case in which the plaintiff was a "highly disturbed individual" whose chronic, undifferentiated schizophrenia "left him functionally disabled," the Eleventh Circuit extended its analysis in Ambers, 736 F.2d at 1469-70, and held that "as a matter of law a person otherwise disabled under the terms of Title II who manages somehow to secure employment will pass into and out of eligibility for benefits when ceasing or embarking upon 'substantial gainful activity'-that is, employment with earnings in excess of the [Commissioner's] guidelines."  Powell, 773 F.2d at 1576.  The Eleventh Circuit thereafter cited with approval the general Powell holding in a case involving a plaintiff with alleged physical, rather than mental, disabling conditions.  See Johnson v. Sullivan, 929 F.2d 596, 599 (11th Cir. 1991) (noting
(continued...)

Because the ALJ's factual finding that Plaintiff was engaging in substantial gainful activity during the entire relevant time period (July 30, 2003-June 2006) is not supported by substantial evidence, remand is required.[16]  Of course, on remand, the ALJ is free to make credibility determinations and to continue the sequential evaluation inquiry past step one in determining whether Plaintiff is disabled.   Furthermore, since the additional medical documentation discussed supra at Part II. C., p. 14 did not make its way into the record and there is no explanation why, the ALJ should attempt to gather the documentation.

## VI.  Conclusion

In accordance with the foregoing, it is **RECOMMENDED**:

---

[15](...continued)
"substantial gainful activity bars benefits only for the period of activity") (citing Powell, 773 F.2d at 1576; Dolbashian v. Sec'y of Health and Human Servs., 688 F.2d 4, 6 (1st Cir. 1982)).

Here, even a determination that Plaintiff was engaging in substantial gainful activity for part of the relevant time period would not serve to bar Plaintiff from being eligible for supplemental security income.  See Powell, 773 F.2d at 1576 (stating "it is not enough merely to note . . . that [the plaintiff] was at least able to work for short periods of time, . . . [n]or is it enough to submit . . . as justification for denial of benefits for the entire period, the fact that for the last ten weeks in a four year period [the plaintiff] had income sufficient to constitute substantial gainful activity") (quotations omitted).  Furthermore, the ALJ did not proceed with the sequential evaluation inquiry to determine whether Plaintiff would be otherwise disabled. Tr. at 15-16.  As previously noted, see supra Part III, the ALJ did state that "[e]ven if the [ALJ] were to conclude that [Plaintiff] did not perform substantial gainful activity, the vocational expert testified that there were jobs such as a Dispatcher or Information clerk which would require only a little standing and six to eight hours of sitting."  Tr. at 16.  Without having proceeded with the sequential evaluation inquiry, however, the ALJ's statement has no real effect.  See Powell, 773 F.2d at 1575 (reiterating the Eleventh Circuit's previous holdings that "the analysis set forth in the regulations promulgated at 20 C.F.R. § 404.1520 must be followed when evaluating a claim for disability benefits" and "[f]ailure to do so constitutes grounds for reversal") (citations omitted); McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986) (noting the sequential evaluation inquiry for supplemental security income and for disability insurance benefits is "[t]he same").

[16]     Given this conclusion, it is unnecessary to determine whether the sale of illegal drugs qualifies as substantial gainful activity.  The undersigned notes, as did the ALJ and as does Defendant, that there is some authority to support such a proposition.  See Tr. at 16 (citing SSR 94-1c; Dotson v. Shalala, 1 F.3d 571 (7th Cir. 1993)); see also Def.'s Mem. at 6 (citing 42 U.S.C. § 423(d)(4); Corrao v. Shalala, 20 F.3d 943, 947 (9th Cir. 1994); Dotson, 1 F.3d at 575-77).

1.      That the Clerk of Court be directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) as incorporated by § 1383(c)(3) **REVERSING AND REMANDING** the Commissioner's final decision with instructions to reevaluate the finding at step one that Plaintiff engaged in substantial gainful activity during the entire relevant time period; to attempt to gather the missing medical documentation; and to take such other action as may be necessary to resolve this claim properly.

2.      That the Clerk of Court be directed to close this case.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on February 9, 2011.

*James R. Klindt*

**JAMES R. KLINDT**
United States Magistrate Judge

kaw

Copies to:

Honorable Marcia Morales Howard
United States District Judge

Counsel of record

*Pro se* party